**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-60128-CR-DIMITROULEAS**

**UNITED STATES OF AMERICA**

vs.

**DEGGORY RYAN CLARK,**
    a.k.a. "Deg,"

    **Defendant.**
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SEVER
DEGGORY RYAN CLARK FROM JOINT TRIAL**

The United States, through the undersigned Assistant United States Attorneys, responds to Defendant Deggory Ryan Clark's motion to be severed from joint trial [ECF No. 89] that the Defendant's motion should be denied.

**FACTUAL BACKGROUND**

1. The evidence to be presented at trial will show that DEGGORY RYAN CLARK (D. CLARK) joined the conspiracy charged in Count 1 of the Indictment upon his release from State prison on May 3, 2025, after which he traveled first to a narcotics trafficking house operated by his brother and co-defendant, CHAD ANTHONY CLARK, a.k.a. "Chop" (C. CLARK) where he left his Florida issued Department of Corrections identification. D. CLARK then traveled to the second narcotics trafficking location in this case, where he operated narcotics location on behalf of his brother, C. CLARK, who had taken over operations for their father upon his incarceration in February 2025.

2. In November 2024, law enforcement became aware of Zone 10

trafficking narcotics out of 817 NW 10th St, Apt. 1, Hallandale Beach, FL 33009 ("HALLANDALE") and 4145 SW 19th St., Apt. 3, West Park, Florida 33023 ("19th STREET"). Based on information provided by a state Confidential Human Source ("CHS"), C. CLARK was operating out of HALLANDALE and his father, Johnny CLARK Jr. (YOB: 1969) was operating 19th STREET. In February 2025, Johnny CLARK Jr. was arrested after being involved in a shooting. An FBI CHS provided intelligence that C. CLARK was now managing both narcotics distribution residences. Further surveillance conducted at both trafficking residences, including the use of pole cameras installed in front of both locations, showed CLARK traveling back and forth between the two trap houses.

3. From February 2025 to May 2025, law enforcement conducted eight (8) controlled purchases from HALLANDALE. Prior to each controlled purchase, the CHS[1] was searched for contraband prior to and after each operation. Law enforcement provided investigative funds to the CHS to purchase crack cocaine from HALLANDALE. Law enforcement also equipped the CHS with audio/video recording devices.

4. The Defendant D. CLARK was released from the Florida Department of Corrections on May 3, 2025, after serving four (4) years' imprisonment for fraudulent use of personal identifying device and obtaining or attempting to obtain a controlled substance by fraud, both felonies under Florida law. CLARK was convicted of these crimes in St. Lucie Counts case no. 2018CF002199, and had been convicted of several felony offenses prior to committing the offenses charged in the Indictment.

## *HALLANDALE & 19TH STREET*

5.      On May 3, 2025, the HALLENDALE camera footage showed codefendant's C. CLARK and MARK BYRON HANDSPIKE, JR., a.k.a. "Weez," enter a black Nissan at that location and drive off. At that time, phone number 954-867-8786 (the "TRAP PHONE")[1] cell site information tracked movement from that location ultimately to Cross City Correctional Institute, in Collier County, Florida and later return to HALLENDALE, where the pole camera footage showed C. CLARK and HANDSPIKE, JR. return in the same vehicle along with D. CLARK. As discussed below, during the search of HALLANDALE on May 12, 2025, law enforcement observed and photographed D. CLARK's prison identification.

6.      On May 5, 2025, the 19th STREET pole camera footage shows D. CLARK drive up at that location in a black Nissan. The 19th STREET pole camera footage consistently shows D. CLARK at 19th STREET during a time where constant traffic of persons going to the direction of 19th STREET and shortly returning.  On several occasions D. CLARK is accompanied by C. CLARK going to and from 19th STREET. On May 8, 2025, the 19th STREET pole camera footage shows codefendant MAKAIL MALIK KNIGHT-LEWIS a.k.a "Lil Takeoff," arrive with another subject.

7.      While D. CLARK was present, the 19th STREET pole camera footage shows activity at 19th STREET that is consistent with drug trafficking. This activity was ongoing from at least as early as May 5, 2025, through the early

---

[1] On April 24, 2025, FBI obtained a search warrant for cell site information for the TRAP PHONE, Case No. 25-mj-6254-VALLE.

3

morning of May 12, 2025, just prior to the FBI executing the search warrant.

## *TRAP PHONE Text Messages*

8. As discussed below, the FBI seized the TRAP PHONE from C. CLARK at HALLADALE on May 12, 2025, during the execution of search warrant. Throughout the course of the conspiracy, narcotics purchasers would send text messages to the TRAP PHONE regarding narcotics. These messages were frequent, including requests for narcotics, for instance, "I need 30" on May 11, 2025. The messages also frequently inquire about which of the two trap houses, HALLENDALE or 19th STREET, the narcotics customer should go to, such as "It's chinaman. Where you at. I went to 19 nobody there. I'm headed over to hallandale" on April 29, 2025, and "It's chinaman. I'm in hallandale. Can I get it there" on May 4, 2025. Also on May 4, 2025, the TRAP PHONE texted another individual "Dis deg call me back" to which the other party responded "Did," then "Deg" to which the TRAP PHONE replied "Ya," evidencing D. CLARK using the TRAP PHONE to communicate.

9. On May 7, 2025, the TRAP PHONE received a message "19?!?," to which the TRAP PHONE responded "Open" at around 5:45 p.m., indicating that the 19th STREET trap house was open for business. The 19th STREET pole camera footage shows minutes before this exchange C. CLARK arrive at 19th STREET in his black Nissan and D. CLARK walk out of 19th STREET to meet C. CLARK and retrieve an apparent fast-food bag. Both D. CLARK and C. CLARK then walk form the parked car to 19th STREET. The pole camera footage also shows numerous individuals approaching 19th STREET for very short periods of

time and then depart, consistent with narcotics activity.

10. On May 8, 2025, law enforcement conducted a controlled purchase operation utilizing an FBI source ("CHS"). Prior to the controlled purchase, law enforcement searched the CHS for contraband and found none. Law enforcement equipped the CHS with audio/video recording equipment and provided the CHS with $200 in ATF investigative funds to purchase crack cocaine from 19th STREET.

11. Law enforcement deployed the CHS from an undisclosed location, and the CHS arrived at 19th STREET without making physical contact with anyone along the way. The CHS approached the 19th STREET and knocked on the door. A male answered the door and discussed the deal with the CHS through a screen door. The CHS then exchanged the $200 of investigative funds for approximately 3.6 grams of suspected crack cocaine. The video of the controlled purchase depicts a single black male visible within 19th STREET during the exchange.

12. CHS then departed the 19th STREET and returned to law enforcement without making any stops along the way. The CHS turned over the drug evidence and was searched a second time for contraband, none was found. The crack cocaine was tested and confirmed to be crack cocaine.

13. The 19th STREET pole camera footage shows that D. CLARK was present at 19th STREET throughout May 8, 2025, with C. CLARK and codefendant MAKAIL MALIK KNIGHT-LEWIS, a.k.a. "Lil Takeoff" ("KNIGHT") arriving at departing at times during the day as well and numerous people

approach 19th STREET for very brief periods of time prior to departing.

14. A review of the pole camera footage outside 19th STREET shows D. CLARK at the 19th STREET trap house frequently between May 5, 2025, and his arrest, captured on the pole camera on May 12, 2025. The pole camera video also reveals D. CLARK interacting with his codefendants, C. CLARK and KNIGHT, as well as numerous interactions consistent with narcotics activity. C. CLARK is seen on the pole camera, arriving at 19th STREET in his black Nissan at around 1:33 a.m. on May 12, 2025, hours before the search warrant was executed at 19th STREET. C. CLARK then left in his black Nissan around six minutes later. At around 5:35 a.m., D. CLARK is visible on the pole camera walking outside 19th STREET, interacting with people in a car, and wearing the same clothing as when he was arrested about 40 minutes later.

*Search Warrant Executed at 19th STREET*

15. On May 12, 2025, law enforcement executed a search warrant at the 19th STREET. FBI Miami SWAT began by announcing law enforcement presence with emergency lights and sirens and then by using a microphone device to call all occupants out of the 19th STREET. After no one exited 19th STREET, FBI Miami SWAT breached the front door to the 19th STREET.

16. The only occupant of 19th STREET was D. CLARK, who yelled that he "was coming out" and walked down the narrow hallway from the only bedroom towards your affiant. SWAT detained D. CLARK and law enforcement cleared the remainder of the 19th STREET.

17. The narrow hallway led directly to the only bedroom in the 19th

STREET with an attached bathroom and closet. Other than the bedroom, attached bathroom, and attached closet, the hallway led to no additional rooms or spaces within the 19th STREET. There was only bed in the bedroom appeared as if D. CLARK had been sleeping just prior to the execution of the search warrant.

18. SWAT found no other person at the 19th STREET other than CLARK at the time of the search warrant execution.

19. During a search for evidence, among other things, law enforcement searched the closet connected to the bedroom. During that search, law enforcement discovered a handgun laying on the floor next to an opened but empty safe. The handgun is a Ruger semiautomatic handgun chambered in .380 caliber bearing serial number 38731914 ("Ruger"). Law enforcement found the Ruger (manufactured outside the State of Florida) loaded with one (1) double-stacked 380 magazine containing a combination of "hollow point" and "full-metal jacket" 380 ammunition.

20. In addition to the Ruger, during the search of the 19th STREET, law enforcement discovered and seized approximately 208.04 grams of suspected crack cocaine. Law enforcement found a bag containing small baggies of suspected crack cocaine in a kitchen cabinet next to $380 USD in cash. Additionally, law enforcement found two bowls containing additional baggies of suspected crack cocaine in the freezer, also located in the kitchen area. Further, law enforcement found numerous boxes of suspected marijuana gummies. Law enforcement seized the suspected marijuana gummies, which weighed

approximately 4.88 kg combined.

21. In addition to the suspected crack cocaine and marijuana gummies, law enforcement observed empty packaging materials matching those used to package the suspected crack cocaine in the bedroom where law enforcement found the Firearm. In the same bedroom and throughout the kitchen area, law enforcement also found the same box-type packaging that contained the suspected marijuana gummies.

22. A review of the pole camera footage outside 19th STREET shows D. CLARK at the 19th STREET trap house frequently between May 5, 2025, and his arrest, captured on the pole camera on May 12, 2025. The pole camera video also reveals D. CLARK interacting with his codefendants, C. CLARK and KNIGHT, as well as numerous interactions consistent with narcotics activity.

*Search Warrant Executed at HALLENDALE*

23. That same day, May 12, 2025, law enforcement executed a search warrant on the HALLENDALE trap house.

24. On approach to the residence, law enforcement observed that C. CLARK's black Nissan was parked in front of HALLENDALE. C. CLARK was in the driver's seat of the vehicle and was immediately detained. C. CLARK was the sole occupant of the vehicle when the vehicle was approached. C. CLARK was searched by law enforcement, he had $3,000.60 in U.S. currency on his person and the TRAP PHONE.

25. HANDSPIKE was in the residence at the time of the search warrant and was detained immediately after. A subsequent search of HANDSPIKE's

person revealed a key chain in which he had a key that unlocked the front door to the residence.

26.     The search of the HALLANDALE trap house revealed approximately 49.4 grams of suspected crack cocaine, approximately 119 grams of suspected marijuana, a pistol (Taurus PT 111, Serial Number TVE89889), and approximately $3,000 in US currency. Law enforcement also located D. CLARK's State of Florida prison identification card

## LEGAL ARGUMENT

"Joint trials play a vital role in the criminal justice system and serve important interests: they reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources." *United States v. Lopez*, 649 F.3d 1222, 1233 (11th Cir. 2011) citing *Zafiro v. United States*, 506 U.S. 534 (1993). Accordingly, "[i]n this circuit, the rule about joint trials is that 'defendants who are indicted together are usually tried together.'" *Id.* at 1234 (quoting *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007)). And, as here, that "rule is even more pronounced in conspiracy cases where the refrain is that 'defendants charged with a common conspiracy should be tried together.'" Id. (quoting United States v. Beale, 921 F.2d 1412, 1428 (11th Cir. 1991)). D. CLARK is charged with conspiring with the other co-defendants in this case to possess with intent to distribute and distribute a controlled substance.

"[T]he rule about a joint trial in conspiracy cases is not quite ironclad. The exceptional circumstances justifying a deviation from the rule, however, are few

and far between. A defendant seeking a severance must carry the 'heavy burden of demonstrating [that] compelling prejudice' would result from a joint trial." *Id.* quoting *Browne*, 505 F.3d at 1268. The defendant has failed to show any prejudice, pointing only to the fact that codefendants were charged in some counts with distributing narcotics on dates prior to his release from prison, and the fact that he was arrested at the 19th STREET trap house rather than the HALLANDALE trap house.

"To show compelling prejudice, a defendant must establish that a joint trial would actually prejudice the defendant and that a severance is the only proper remedy for that prejudice—jury instructions or some other remedy short of severance will not work." *Id.* quoting *Zafiro*, 506 U.S. at 539–41; *United States v. Blankenship*, 382 F.3d 1110, 1122–23 (11th Cir.2004). The defendant argues that D. CLARK had no apparent role in managing or directing the gang. This assertion does not bear on the existence of the conspiracy and the government's evidence offered to prove the conspiracy.

The defendant also asserts that there may be mutually antagonistic defenses. "The potential for prejudice from a joint trial is not enough, and not just any kind of prejudice will do. For example, the Supreme Court explained in *Zafiro* that '[m]utually antagonistic defenses are not prejudicial per se.'" *Lopez*, 649 F.3d at 1233 quoting *Zafiro*, 506 U.S. at 538. *Zafiro* "specifically rejected the notion that defendants who have contradictory defenses are inherently prejudiced." *Blankenship*, 382 F.3d at 1122. "And 'it is well settled that defendants are not entitled to severance merely because they may have a better

10

chance of acquittal in separate trials.'" *Lopez*, 649 F.3d at 1234 quoting *Zafiro*, 506 U.S. at 540. "Anything that increases the likelihood of a conviction 'prejudices' the defendant in the ordinary sense of the word, but in severance law 'prejudice' is not used in the ordinary sense of the word." *Id.*

"Because limiting instructions usually will cure any prejudice resulting from a joint trial, the Supreme Court has indicated that severances need be granted only if there is a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury from making a reliable judgment about guilt or innocence' even if limiting instructions are given." *Id.* (citations omitted). "Aside from those two situations, jointly indicted defendants are not entitled to a severance." *Id.*; (See Blankenship, 382 F.3d at 1123).

The defendant claims that his Sixth Amendment rights may be violated. Should one of his codefendants elect to testify, the defendant would be able to conduct questioning of the codefendant, preserving his Sixth Amendment right. Fifth and Sixth Amendment "rights are only rarely jeopardized by a joint trial." *Id.*

This case is not a case where "the sheer number of defendants and charges, the differing levels of culpability, and the massive amount of evidence make it nearly impossible for a jury to sort through the evidence and issues and reliably determine the guilt or innocence of each defendant on each charge." *Id.* The court sets "[t]he bar for showing that kind of prejudice is so high that only in the rarest case can a defendant clear it, as indicated by the fact that we have

declined to find that severance was required in some complex, multi-defendant cases." *Id.*[2]

[THIS SPACE INTENTIONALLY LEFT BLANK]

---

[2] See, e.g., *United States v. Hill*, 643 F.3d 807, 819–20, 827–34 (11th Cir.2011) (affirming the denial of severance in a mortgage fraud case where there were 12 defendants, a 187–count indictment involving more than 300 transactions, over 1,100 exhibits filling 8 filing cabinets, and more than 100 witnesses); *United States v. Kopituk*, 690 F.2d 1289, 1320 (11th Cir.1982) (affirming the denial of a severance in a labor corruption case involving 12 defendants, a 70–count indictment, 130 witnesses, and a seven-month trial resulting in 22,000 pages of transcript); see also *United States v. Hernandez*, 921 F.2d 1569, 1580–81 (11th Cir.1991) (collecting some of the more complex cases in which this Court has found that the district court did not abuse its discretion in denying severance).

## **CONCLUSION**

The defendant has not established that a joint trial would compromise a specific trial right or prevent the jury from making a reliable determination as to guilt or innocence. Severance of the defendant is improper. The defendant's motion to sever should be denied.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By: /s/ Corey R. O'Neal
Corey R. O'Neal
Assistant United States Attorney
Court ID No. A5503031
500 E. Broward Boulevard Suite 700
Fort Lauderdale, Florida 33394
Telephone: 954-660-5996
Email: Corey.O'Neal@usdoj.gov

By: /s/ Joseph A. Cooley
JOSEPH A. COOLEY
Assistant United States Attorney
Florida Bar No. 966460
500 East Broward Boulevard, 7th Fl.
Fort Lauderdale, Florida 33394
Tel: 786-761-3179
Fax: 954-356-7230
Email: joseph.cooley2@usdoj.gov